IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.   CRIMINAL ACTION NO.  3:22-00148

VAN LEE HARRELL

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Van Lee Harrell's Motion to Suppress. ECF No. 23. On September 28, 2022, the Court held a hearing on the motion and directed the parties to file supplemental briefing. With that briefing now complete, the Court **DENIES** Defendant's motion.

On December 5, 2018, law enforcement officers conducted surveillance at a residence located on Marshall Avenue in Huntington, West Virginia, based on information that a wanted felon, possessing guns and drugs, was residing there. On that day, officers observed Defendant and a child going in and out of the residence, but they deferred arresting him on the fugitive warrant at that time. Two days later, on December 7, Sergeant Stephen Maniskas, of the Huntington Police Department, obtained a search warrant to search for and arrest Defendant at the residence.

On December 12, officers went to the residence to execute the warrant. At approximately 1:40 p.m., officers knocked on the front door and quickly entered the house, calling out their presence. After entry, the officers encountered Defendant and his companion, Jessica Slone, either in the basement or on the basement stairs. Sgt. Maniskas accompanied Ms.

Slone out of the residence, while Detective Adrian Rosario, of the Huntington Police Department, and other officers performed a protective sweep inside the residence.

Detective Rosario testified they had information there potentially was a child in the house and they believed there were weapons and possibly could be other individuals as Defendant was known as a drug trafficker. As part of the sweep, Detective Rosario went to the basement where Defendant and Ms. Slone had been just before officers encountered them. In the basement was a bed with a two-tiered bed frame, with a large frame centered on top of a small frame. The larger frame left an overhang and recessed area underneath it. Detective Rosario testified that, as the headboard was pushed against the wall, there was a void underneath the large frame that was approximately 18 to 24 inches tall and wide, running from one side of the bed to the other. Detective Rosario stated he believed the space was big enough for someone to hide. However, when Detective Rosario looked in the space to see if anyone was there, he instead observed a rifle. At the hearing, the Government introduced a photograph of the area showing the rifle, two pistols, cash, and other possible contraband in the recessed area.

Just before 2:00 p.m., Defendant and Ms. Slone were escorted from the scene to police headquarters. Both Detective Rosario and Sgt. Maniskas also left the scene and went to headquarters at that time. Sgt. Maniskas then prepared an affidavit for a search warrant of the residence. At 2:42 p.m., a state magistrate signed the search warrant, and Sgt. Maniskas immediately called the officers waiting at the residence to commence a full search. During that search, officers found additional firearms, ammunition, suspected drugs, and other contraband.

At the hearing, Ms. Slone testified and described the frame of the bed slightly differently than Detective Rosario. She agreed there was a gap under the bed and estimated it was 15 to 18 inches wide and about as deep as the length of her arm. She maintained the area was not big enough for an adult to hide. However, she admitted a child had stayed with them a week earlier, which is consistent with what officers noted during their surveillance.

After Ms. Slone and Defendant were taken outside, she said she stood about ten feet from the house. While standing there, she said she could hear officers in the house making a ruckus for about ten minutes. She testified she heard food dropping to the floor, cupboards and doors opening and closing, and couches being moved.

Based primarily on Ms. Slone's testimony, Defendant argues the officers exceeded the scope of a protective sweep by searching in areas where no one possibly could be hiding, such as in the recessed area under the bed, in cupboards, and in food containers. In support, Defendant cites the Fourth Circuit's recent decision in *United States v. Buster*, 26 F.4th 627 (4th Cir. 2022). In that case, two patrol officers were notified of a domestic dispute involving the discharge of a firearm. 26 F.4th at 630. Thinking the defendant might be the assailant, the officers attempted to stop him as he was walking down a street. The defendant declined to stop and talk with the officers and kept walking. Ultimately, the defendant took off running, tripped, and fell. The officers then tackled and handcuffed him. *Id.* The officers also cut the strap to a bag the defendant was carrying because the defendant said the bag was choking him. The officers noted the bag felt hard, which they said indicates a weapon. They opened the bag and found a gun and a box of ammunition. *Id.* The officers then began asking questions of

the defendant and discovered additional ammunition in a pocket. Once the defendant was at the police station, the officers realized that they had forgotten to read the defendant his Miranda rights. Therefore, they read the defendant his rights. *Id.* The officers then basically elicited the same statements from the defendant as he had given them prior to being read his rights. The defendant was charged with being a felon in possession of a firearm, to which he filed a motion to suppress. *Id.*

Although the district court held the search of the bag was a constitutionally reasonable protective sweep, the Fourth Circuit disagreed. The Fourth Circuit stated that "a protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id*. at 634 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quotation marks omitted)). In *Buster*, however, the parties agreed the defendant was handcuffed and, also, he was outside in the open, not in a house at the time of his arrest, and he had no access to the bag's contents. Therefore, the Fourth Circuit concluded the firearm must be suppressed, reasoning the "doctrine authorizing a limited warrantless search to protect officer safety cannot be stretched to cover situations where there is no realistic danger to officer safety." *Id.* at 635.

In the present case, Defendant agrees in his Surreply that officers are permitted to do a protective sweep of the house for safety purposes. *See Surreply to the Govt's Surresponse to Def.'s Motion to Suppress*, at 1 ("Defendant and his counsel do not deny that a protective sweep is proper to protect officers and others from unknown harms within a house or dwelling.").

However, he argues this case is comparable to *Buster* as neither he nor Ms. Slone presented any danger to the officers when they were detained in the front yard, and the officers exceeded the scope of a protective search by looking in places where it was impossible for people to hide, such as the area under the bed, in cupboards, in the refrigerator, and in food packaging. Therefore, Defendant maintains the officers violated the Fourth Amendment by searching his house before they obtained the second warrant. Upon review, the Court disagrees and finds the officers ability to search a house for people who may be hiding inside is clearly distinguishable from *Buster*, in which officers searched a bag that the defendant no longer could access.

As stated in *Maryland v. Buie*, 494 U.S. 325 (1990), "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." 494 U.S. at 327. In this case, Ms. Slone testified that she told officers there was no one else in the house. Despite Ms. Slone's assurances, the officers were under no obligation to simply accept her statement at face value and forego a protective sweep. Additionally, although Ms. Slone believed the area under the bed was too small for an adult, even if true, officers knew there was a child at the residence the previous week, and they needed to make sure the child was not hiding under the bed or somewhere else in the house.

Moreover, Sgt. Maniskas testified that officers have found people hiding under beds in the past, and the Fourth Circuit expressly has held "that searching under beds is within the ambit of a protective sweep." *United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010) (citation omitted). Sgt. Maniskas also stated they have found people hiding in very small and

unusual places. He testified that once they once found a grown adult hiding in a kitchen cupboard.

As part of its evidence, the Government introduced a photograph of the space under the bed. The photograph appears to be consistent with Detective Rosario's description of the area. There is wood on the top and right side of the space, carpet on the floor, and a wall and some fabric on the left side. For his part, Defendant did not introduce any other photographs that showed any different perspective of the area. In examining the photograph and considering the testimony, the Court finds that that a child, or possibly even a small adult, could fit within the space. As it also is an area where the police know people sometimes hide and the Fourth Circuit has recognized it as an acceptable place to look during a protective sweep,[1] the Court finds that Detective Rosario did not violate Defendant's Fourth Amendment rights by looking under the bed.[2]

Even if there was no constitutional violation for searching under the bed, Defendant contends the officers continued to search the house under the pretext of a protective sweep in areas in which there could not possibly be someone hiding, such as cabinets, the refrigerator, and in food packaging. Although Ms. Slone testified the officers were making a

---

[1] Although not specifically fleshed out in the testimony, the Court also recognizes that it is common knowledge that children frequently crawl under beds when they are trying to hide so it would be an obvious place for officers to look.

[2] The Court also appreciates that Detective Rosario likely could not have known precisely how big the space under the bed was before he looked underneath and saw it. X-ray vision is not a quality demanded of police officers. After observing the design and position of the bed, it was reasonable for him to give a quick look to see if anyone could be hiding there, particularly as underneath beds are known hiding places.

ruckus in the house and she could hear food hitting the floor, she conceded that she could not see what actually was going on in the house because she was outside. Nonetheless, the next day when she back inside the house, she found food packaging on the floor, couches turned over, and things out of the closets, which is consistent with what she heard.

Contrary to Ms. Slone's testimony, however, Sgt. Maniskas, testified he did not recall hearing any ruckus in the house after he walked outside with Ms. Slone while the other officers completed the rest of the sweep. He stated the sweep was over before he left the scene and it only took a matter of minutes. Once he left, he did not know what the officers on the scene exactly were doing, but he stated they typically stand around out front and talk or sit in their cars and play on their phones while they wait to hear if a search warrant for the house is issued.

Likewise, Detective Rosario, who participated in the entire sweep, estimated it took ten to fifteen minutes to make sure the residence was clear, and he stated he did not see any officer reenter the house after it was marked as secure. Although he did not have a specific recollection, Detective Rosario believed all the officers had exited the house after the sweep, and, similar to Sgt. Maniskas, he said it is very common for the officers on the scene just to wait around for a second warrant to be issued. During his testimony, Detective Rosario also explained that officers do not open wallets, drawers, or food packaging during protective sweeps. Rather, their purpose is to make sure there are no other people inside the residence. In this case, they were particularly concerned that there could be a child hiding in the house.

Although Defendant in this case insists the police exceeded a cursory inspection of the house, the only evidence Defendant has to support his claim is Ms. Slone's testimony she heard officers rummaging through things in the house and, when she went inside the house the next day, she found things such as food on the floor and couches overturned. However, she could not see inside the house when she said she heard the ruckus, and the officers—who were in the house—stated they only searched places where someone might be hiding. Even if the search included looking behind couches and in cupboards, the Court finds those places are consistent with the officers' testimony that they have found people in unusual and small places, including inside a cupboard. Moreover, the officers knew there possibly was a child hiding in the house, which gives them even more reason to look in small places that a child could fit. In addition, the fact Ms. Slone said there was food on the floor tells the Court little about whether officers exceeded the preliminary sweep. Assuming Ms. Slone heard food hitting the floor while she was outside, it simply could have fallen when a cupboard door was opened. On the other hand, if Ms. Slone's was wrong about what she heard, it could be that the food ended up on the floor when the second search warrant was executed. There simply is no credible evidence that the protective sweep extended beyond a space where a person could have been found. *See id.* at 376 ("A protective sweep . . . extends only to a limited inspection of spaces where a person may actually be found.").[3] Even if some officers exceeded the bounds of a proper protective sweep, there is no evidence that incriminating material was discovered, much less used, to obtain the second search warrant.

---

[3]Ms. Slone also mentioned she heard a refrigerator door open. However, given the basic mechanical principles of magnetic refrigerator doors, the Court finds it difficult to believe Plaintiff could distinguish the sound of a refrigerator door opening and closing from outside in the yard.

Defendant argues there were numerous pictures taken by officers at the scene that could prove, one way or another, whether the full-scale search of the house occurred before or after the second warrant was issued if the Government would provide Defendant with the time-stamp information for the pictures. As Sgt. Maniskas explained, however, they do not have that information. After the pictures were taken, they were transferred from the camera's SD card to a reporting system and stored as a PDF file. The PDF file recorded the date of the download, not when the pictures were taken. The SD card then was wiped clean and reused, making it impossible to get the original data. Thus, the Government maintains the time-stamp data is simply unavailable. The Government did submit one photograph, however, that it maintains shows the search occurred after the second warrant was issued. The photo is of a cellphone found during the search with an incoming call at 3:31 p.m. *Digital Photo – IMG 4010*, ECF No. 39-4. Defendant does not challenge the validity of the photo. Instead, he argues it does nothing to prove that the officers did not thoroughly search the house before they obtained the second warrant. The Court disagrees and, although not conclusive, lends additional support to the fact the officers did a complete search of the house and took photographs of the evidence after the second warrant was issued.

Accordingly, in light of the totality of the testimony and evidence submitted to the Court, the Court finds the officers lawfully conducted a protective sweep of the house. In addition, the Court gives little weight to Ms. Slone's testimony about what she thought might have been going on inside the house while she was standing in the yard. In fact, except for the inference that officers were looking for contraband in food containers during the protective sweep and some food spilled on the floor, the other noises Ms. Slone plausibly described—the

opening of doors and cabinets—are consistent with places officers have found people hiding in the past. The fact they were actively looking for a child makes a cursory glance in these places even more reasonable. Moreover, Ms. Slone testified the "ruckus" only lasted about ten minutes, which is consistent with how long Detective Rosario said it took to do a protective search. Quite simply, the Court finds no reason to believe the officers conducted a thorough search of the residence as part of the protective sweep and before the second search warrant was issued. Therefore, the Court **DENIES** Defendant's Motion to Suppress.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: October 27, 2022

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE